UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ELLEN REGAN,

                 Plaintiff,

   -against-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                 Defendant.

------------------------------------------------------------x

**MEMORANDUM
DECISION & ORDER**

09 Civ. 2777 (BMC)

**COGAN**, District Judge.

       This is an appeal of the Commissioner of Social Security's denial of plaintiff's

application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("the Act"). Plaintiff contends that, due to severe medically determinable impairments including

back pain, neck pain, and depression, she is "disabled" as defined by 42 U.S.C.

§ 1382c(a)(3)(A). Presently before the Court are plaintiff's and defendant's cross-motions for

judgment on the pleadings. For the reasons stated below, the Commissioner's motion is denied,

and plaintiff's motion is granted to the extent that the case is remanded for further proceedings

consistent with this opinion.

## BACKGROUND

**I.     Procedural History**

       Plaintiff applied for SSI benefits on December 9, 2005, contending that she had been

disabled since April 1, 2002. After plaintiff's application was denied on July 14, 2006, she

requested a hearing before an Administrative Law Judge ("ALJ"). The hearing was begun on

December 10, 2007, adjourned in order to afford plaintiff time to submit additional medical

records, and completed on May 12, 2008. In a decision dated June 10, 2008, the ALJ found that plaintiff was not disabled. (decision of ALJ Manuel Cofresi). Thereafter, plaintiff requested that the Appeals Council review the ALJ's decision. On February 12, 2009, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision on Ms. Regan's claim for benefits. This appeal followed.

## II. Non-Medical Facts

At the time of plaintiff's May 2008 hearing before the ALJ, she was thirty-five years old. She was educated through the tenth or eleventh grade in special education classes, but dropped out of school after becoming pregnant at age 15. As a teenager and young adult, plaintiff used drugs, including crack cocaine. She has been arrested on at least four occasions for possession or sale of drugs, and was incarcerated for a total of eighteen months. Plaintiff testified that she ceased using drugs following a treatment program in 1993.

Plaintiff testified she has suffered from debilitating depression and anxiety attacks since her 17-year-old daughter was killed by a hit-and-run driver in September 2005. She also testified that she suffers from physical ailments including herniated discs in her back and neck, pain in her neck, mid-back, lower-back and hips, shooting pains in her left leg, spasms in her feet, and migraine headaches. She stated that she suffers from pain "[e]veryday, all day," which is alleviated only temporarily by the narcotic pain medication Percocet.

Plaintiff testified that she has not had significant employment for more than a decade. She had worked as a home health aide from 1995 to 1999, but left that position either due to back pain, or because the company went out of business. Following the termination of her home health aide position, plaintiff worked for approximately three to four months at the Burlington Coat Factory as a seasonal employee. She last worked in 2000, as a seasonal postal employee

2

sorting foreign mail, a position that lasted two months. Plaintiff listed the following annual income figures for the years 1995 to 2001: $475 in 1995; $1028 in 1996; $484.02 in 1997; $82.32 in 1998, $0 in 1999; $581.23 in 2000; and $605.48 in 2001.

## III.  Medical Facts

### A.  *Psychological Medical History*

Plaintiff's first available medical records are from an October 25, 2005 appointment at which plaintiff informed Dr. Sandra Nurse of Queens-Long Island Medical Group that plaintiff's daughter had been killed in a hit and run accident the previous month. Dr. Nurse found that plaintiff had anxiety and insomnia. She gave plaintiff a prescription for Ativan[1] and a referral to mental health counseling. *Id.* Plaintiff began weekly counseling sessions shortly thereafter with Eliezer Entel, a licensed social worker. On December 12, 2005, plaintiff returned to Dr. Nurse without an appointment, "demanding" a prescription for Ativan. Dr. Nurse prescribed Paxil,[2] for anxiety and depression. On December 2, 2005, as part of New York's WeCare program,[3] plaintiff was evaluated by internist Dr. Krishna Badhey, who prepared a "biopsychosocial report." Dr. Badhey's physical examination did not reflect any physical abnormalities, but Dr. Badhey observed that plaintiff had suffered from depression for the prior two months which had

---

[1] Ativan, a brand-name preparation of the medication lorazepam, is a member of the class of drugs known as benzodiazepines, and is used to treat anxiety. *See* Mayo Clinic Staff, *Lorazepam, available at* http://www.mayoclinic.com/health/drug-information/DR602797 (last accessed Apr. 8, 2010).

[2] Paxil, a brand-name preparation of the medication paroxetine, is a member of the class of drugs known as selective serotonin reuptake inhibitors, and is used to treat, *inter alia,* depression and anxiety. *See* Mayo Clinic Staff, *Paroxetine, available at* http://www.mayoclinic.com/health/drug-information/DR601687 (last accessed Apr. 8, 2010).

[3] According to the New York City Human Resources Administration's ("HRA") website, the Wellness, Comprehensive Assessment, Rehabilitation and Employment ("WeCARE") program, administered by the Arbor company, "provides a continuum of health, wellness and employment-focused services for public assistance applicants and recipients who may have medical or mental health barriers to employment." *See* HRA, Wellness, Comprehensive Assessment, Rehabilitation and Employment Program, http://www.nyc.gov/html/hra/html/partners/serv_wecare.shtml (last accessed Apr. 8, 2010).

been mild in degree and relieved by the use of medication. The report notes that plaintiff "has little interest or pleasure in doing things. She shows no interest in seeing or talking to other people. She has problems leaving the house. . . . She gets anxious in social situations. She often feels sad or depressed. She has difficulty with sleep patterns." The report further notes that plaintiff complained of difficulties with the following activities: "taking care of self, moving in or out of a bed/chair, walking outdoors, walking several blocks, walking one block/climbing one flight of stairs, concentrating and /or remembering," and occasional difficulty with "doing work around the house, doing errands such as grocery shopping, driving a car or using public transportation." *Id.* Dr. Badhey diagnosed depression secondary to family bereavement and concluded that plaintiff's "functional capacity outcome" was "unstable" in light of plaintiff's medical and/or mental health conditions that required further treatment.

On December 21, 2005, plaintiff was seen at St. John's Episcopal Hospital's Community Mental Health Center ("CMHC"). An intake evaluation by licensed social worker Zannie Viard-Alouidor noted that plaintiff had suicidal ideations, an irritable and gloomy affect, a depressed mood, a sad facial expression, slow speech, and a lethargic level of consciousness, but otherwise appeared to have normal psychomotor and cognitive function and good memory. Plaintiff reported that she had been depressed since her daughter's death and that she has felt her daughter's spirit and heard her voice while at home. Plaintiff also reported that her daughter's father, with whom she had a close relationship, had also recently died. The social worker noted that plaintiff appeared to display symptoms of bereavement related to her daughter's death, and diagnosed Depressive Disorder Not Otherwise Specified ("NOS").

4

A psychiatric evaluation was subsequently performed by Dr. Vladimir Glauberson at CMHC in January of 2006. His notes state that plaintiff's mother died of HIV when she was 20 years old, that her common-law husband had recently died of throat cancer, and that plaintiff has suffered from anxiety attacks, occasional suicidal ideations, depression, anger, poor sleep and poor appetite since the recent death of her daughter. He observed that plaintiff was alert, oriented to person, time, and place, her thought processes were intact, she had no delusions, her insight was poor, and her judgment was fair. Dr. Glauberson diagnosed Impulse Control Disorder NOS and Adjustment Disorder with anxious or depressed mood. He was not able to eliminate the diagnosis of Post-Traumatic Stress Disorder ("PTSD"). He noted that plaintiff might also have Borderline Personality Disorder in view of her irritability and hostility during the interview. He prescribed individual therapy, Prozac,[4] and Ativan. Dr. Glauberson rated plaintiff's Global Assessment of Functioning at 50.[5]

On April 11, 2006, licensed social worker Entel completed a questionnaire from the New York State Office of Temporary and Disability Assistance. He reported that he had seen plaintiff approximately once per week for counseling sessions from October 31, 2005 to April 11, 2006, and identified plaintiff's current symptoms as depression, lack of focus, and interrupted sleep. Mr. Entel diagnosed Dysthymic Disorder.[6]  The questionnaire states that plaintiff's attitude, appearance, and behavior were normal, her mood and affect were depressed and that she had

---

[4] Prozac, a brand-name preparation of the medication fluoxetine, is a member of the class of drugs known as selective serotonin reuptake inhibitors, and is used to treat depression. *See* Mayo Clinic Staff, *Fluoxetine, available at* http://www.mayoclinic.com/health/drug-information/DR600689 (last accessed Apr. 8, 2010).

[5] The GAF scale is a scale used by mental health professionals to judge overall levels of functioning. The scale ranges from 0 to 100, with 100 reflecting superior functioning. *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed. rev. 2000). A GAF of 41 to 50 reflects "Serious symptoms" or "any serious impairment in social, occupational, or school functioning."

[6] Dysthymic Disorder refers to a mild but chronic form of depression. *See* Mayo Clinic Staff, *Dysthymia, available at* http://www.mayoclinic.com/health/dysthymia/DS01111 (last accessed Apr. 8, 2010).

some loss of focus on tasks. Plaintiff had no memory limitation and no limitation regarding her ability to understand. Her ability to sustain concentration and persistence were described as limited due to her inability to remain focused. She had no limitation in the areas of social interaction and adaptation. *Id.* Mr. Entel stated it was "unclear" whether plaintiff had the ability to function in a work setting, but he declined to provide a medical opinion regarding plaintiff's ability to perform work-related activities. On April 20, 2006, the same questionnaire was completed by licensed social worker Viard-Alouidor and signed by Dr. Glauberson. The questionnaire notes that plaintiff had attended weekly individual therapy sessions, and was seen monthly for medication management for the conditions of Impulse Control Disorder NOS, and Adjustment Disorder with mixed anxiety and depression. Plaintiff's symptoms were listed as depressed mood, poor appetite, sleep disturbance, crying spells and suicidal ideation. At the time, plaintiff was taking Ambien[7] and Ativan (lorazepan). On mental status examination, plaintiff's mood appeared down, her affect was appropriate, her thought process, perception and concentration were fair and she had no limitation regarding her memory or her ability to understand or adapt. Dr. Glauberson assessed that plaintiff's sustained concentration and persistence were limited, her social interaction was poor, and she was easily agitated. He noted that she displayed some agitation when questioned, and concluded that her ability to work may be impaired due to her impulsivity and depressive symptoms.

In an update provided to a social security employee in June 2006, Dr. Glauberson described plaintiff's diagnoses as Impulse Control Disorder NOS and Borderline Personality

---

[7] Ambien, a brand-name preparation of the medication zolpidem, is a member of the class of drugs known as central nervous system depressants, and is used to treat insomnia. *See* Mayo Clinic Staff, *Zolpidem*, *available at* http://www.mayoclinic.com/health/drug-information/DR601839 (last accessed Apr. 8, 2010).

Disorder, with PTSD to be ruled out. He noted that Seroquel[8] had been added to plaintiff's prescribed psychiatric medications. Dr. Glauberson stated that plaintiff had reported multiple significant psychiatric symptoms, including hearing her dead daughter's voice and occasional passive suicidal thoughts. He reported that plaintiff had been uncooperative in sessions, and had been threatening, disrespectful and rude toward a previous psychiatrist, and that the police had been called on at least one occasion. Dr. Glauberson saw plaintiff's "biggest problem as anger" which he felt "would significantly impair her relationship w[ith] any supervisor." He stated that plaintiff was not interested in working, but had that in terms of functionality, she was capable of doing things for herself. *Id.*

On May 30, 2006, a consultative psychiatric evaluation of plaintiff was performed by Arlene Broska, Ph.D. Plaintiff reported feeling depressed, guilty, irritable, hopeless, and worthless. She also reported auditory and visual hallucinations. She stated that she was able to dress, bathe and groom herself, but that she was too depressed to cook, clean, do laundry, or shop. *Id.* At the time, plaintiff's medications included Seroquel, Ambien, lorazepam, Tylenol #3,[9] Combivent, and loratadine.[10] Dr. Broska observed that plaintiff was cooperative, her manner of relating, social skills and overall presentation were adequate, her thinking was

---

[8] Seroquel, a brand-name preparation of the medication quetiapine, is a member of the class of drugs known as atypical antipsychotics, and is used to treat schizophrenia, bi-polar disorder, and as an add-on treatment to an antidepressant for patients with major depressive disorder who did not have an adequate response to antidepressant therapy. *See* FDA prescribing information for Seroquel XR, *available at* http://www1.astrazeneca-us.com/pi/Seroquel.pdf (last accessed Apr. 8, 2010).

[9] Tylenol #3 is a prescription medication used to treat pain, and is composed of acetaminophen, codeine, and caffeine.

[10] Combivent, a brand-name preparation of the medications ipratropium and albuterol, is used to help control the symptoms of lung diseases, such as asthma, chronic bronchitis, and emphysema. *See* Mayo Clinic Staff, *Ipratropium and Albuterol (Inhalation Route)*, *available at* http://www.mayoclinic.com/health/drug-information/DR600177 (last accessed Apr. 8, 2010). Loratadine is a non-prescription antihistamine sold under various brand names including Claritin. *See* Mayo Clinic Staff, *Allergy medications: Know your options*, *available at* http://www.mayoclinic.com/health/allergy-medications/AA00037 (last accessed Apr. 8, 2010).

coherent with no evidence of delusions or paranoia, and her affect was appropriate. Plaintiff's mood was dysthymic, her attention, concentration and memory skills were mildly impaired, and her insight and judgment were poor. Dr. Broska diagnosed Major Depressive Disorder, Severe, with psychotic features, and cocaine abuse in remission. She concluded that plaintiff could follow and understand simple instructions and perform simple tasks independently, but may have difficulty in learning new tasks, performing some complex tasks independently, making appropriate decisions, maintaining attention and concentration, keeping a regular schedule, relating adequately with others, and dealing appropriately with stress. She further concluded: "Results of the examination appear to be consistent with psychiatric problems, and this may significantly interfere with the claimant's ability to function on a daily basis."

On June 27, 2006, consultative psychologist M. Graff completed the Social Security form "Mental Residual Functional Capacity Assessment" (Form SSA-4734-BK-SUP), which assesses plaintiff's residual functional capacity ("RFC") with respect twenty categories of mental activity.[11] Dr. Graff found a marked limitation in plaintiff's ability to set realistic goals or make plans independently of others, and found moderate limitations in 12 of the remaining 19 areas, including the ability to maintain attention and concentration for extended periods, to perform activities with a schedule, to maintain regular attendance, to work in coordination with or close to others without being distracted, to complete the normal workday or workweek without interruptions from psychologically based symptoms, and to work appropriately with supervisors, colleagues and the general public. Dr. Graff observed that plaintiff's mental status findings were remarkable for dysthymic mood and poor insight/judgment, but that she otherwise possessed no more than mild to moderate impairment, and that there was no evidence of perceptual

---

[11] "Residual functional capacity" is what a person is still capable of doing despite limitations resulting from physical and mental impairments. 20 C.F.R. § 416.945(a).

abnormalities because "claimant's report of hallucinations have not been validated by objective observation." She concluded that plaintiff would function best in an entry-level position with minimal interpersonal contact. *Id.* Dr. Graff also completed the form "Psychiatric Review Technique" (Form SSA-2506-BK), which compares a claimant's psychological impairments to the disorders which the Social Security Administration considers *per se* disabling conditions. Dr. Graff concluded that the evidence did not establish that plaintiff's psychological impairments were *per* se disabling under SSA guidelines.

Plaintiff was evaluated by Dr. Anil A. Mathew at Arbor WeCare on August 2, 2006. Dr. Mathew noted that plaintiff had a history of depression. He also noted that plaintiff may have a history of psychosis. After performing a physical examination, Dr. Mathew ordered a psychiatric consultation. When prompted by a "Phase I Medical Evaluation Form" to select the functional capacity best describing plaintiff, he checked "employable with limitations," the third of five options reflecting an increasingly limited ability to work (the non-selected options were "no functional limitation," "employable with minimal accommodations," "temporarily unable to work," and "unable to work for at least 12 months."). Dr. Mathew additionally noted that plaintiff required that a job be a low stress environment, have a sit/stand option, and not require heavy lifting.

On February 20, 2007, plaintiff was seen in the emergency room at St. John's Episcopal Hospital following a motor vehicle accident. The examining physician, Dr. Tuere Franklin, noted that after conducting a physical examination (discussed more fully below), plaintiff had become belligerent and refused to leave. *Id.*

Plaintiff began treatment at Rockaway Mental Health Services ("Rockaway") in May 2007. An intake assessment on May 14, 2007 by licensed social worker Eileen Butler states that plaintiff had been referred by the "crisis team" after a psychiatrist at St. John's Episcopal Hospital felt threatened by plaintiff and had called security. At the intake interview, plaintiff initially appeared extremely agitated. She later became calm and cooperative, but was upset with her prior doctor because she felt he was "playing mind games with her," and because she felt that he refused to address her dissatisfaction with her prescribed medications. *Id.* She stated that she was frustrated that she did not know who killed her daughter, and believed the police were involved because the car that hit her daughter was black with tinted windows, and because the police had stopped accepting plaintiff's calls after three months. *Id.* She stated that her psychological health was worse than when she began treatment at CMHC. She reported feeling unsafe, and stated that she had a lack of patience and a dislike of crowds. *Id.* The diagnoses were depression, bereavement and Borderline Personality Disorder.

Rockaway Psychiatrist Dr. Dogot evaluated plaintiff on May 17, 2007. She described plaintiff's mood as depressed, her affect as constricted, and her insight as fair, but her memory, judgment, impulse control and thought processes were not impaired. *Id.* Dr. Dogot diagnosed Severe Depressive Disorder and a history of drug dependence. He evaluated plaintiff as having a GAF of 50 and gave a prognosis of "guarded." Plaintiff thereafter attended weekly counseling sessions with a licensed social worker and saw a psychiatrist monthly for medication management. At various times during her treatment at Rockaway, plaintiff was prescribed the psychiatric medications Cymbalta,[12] Klonopin,[13] Lexapro,[14] Prozac, and Ativan (lorazepam).

---

[12] Cymbalta, a brand-name preparation of the medication duloxetine, is an SSRI used to treat mental depression and generalized anxiety disorder. *See* Mayo Clinic Staff, *Duloxetine, available at* http://www.mayoclinic.com/health/drug-information/DR601577 (last accessed Apr. 8, 2010).

Plaintiff's medical records also reflect use of the pain medications Vicodin and Darvocet,[15] and the medication Requip.[16]

The record contains progress notes from weekly counseling sessions by licensed worker Butler for the period May 2007 through January 2008. Plaintiff missed a number of appointments. The records reflect that plaintiff at times reported some improvement but also reported continued psychological symptoms including depression, paranoia, feelings of isolation, and difficulty sleeping. On October 1, 2007, plaintiff expressed that she believed that the police were covering up the fact that they killed her daughter. On November 14, 2007, plaintiff stated that a man had recently asked her out on a date, and that he had mentioned her daughter's death. She became angry, "got loud with him," and asked him if he knew who pushed her daughter. On November 26, 2007, plaintiff reported not feeling depressed, and stated that if she did not get disability then she would like to become a phlebotomist. On November 19, 2007, plaintiff implied that unknown witnesses were refusing to reveal the true circumstances of her daughter's death, and stated that she would not be able to make progress until she found out what truly happened. On December 3, 2007, plaintiff reported that the medications had helped to some

---

[13] Klonpin, a brand-name preparation of the medication clonazepam is a benzodiazepine used, *inter alia*, to treat panic disorder. *See* Mayo Clinic Staff, *Clonzepam*, *available at* http://www.mayoclinic.com/health/drug-information/DR602741 (last accessed Apr. 8, 2010).

[14] Lexapro, a brand-name preparation of the medication escitalopram, is an SSRI used to treat mental depression and generalized anxiety disorder. *See* Mayo Clinic Staff, *Escitalopram*, *available at* http://www.mayoclinic.com/health/drug-information/DR600627 (last accessed Apr. 8, 2010).

[15] Vicodin and Darvocet are prescription narcotic medications used to treat pain. *See* Mayo Clinic Staff, *Narcotic Analgesics and Acetaminophen*, *available at* http://www.mayoclinic.com/health/drug-information/DR602295 (last accessed Apr. 8, 2010).

[16] Requip, a brand-name preparation of the medication ropinirole, is used, *inter alia*, to treat a condition called Restless Legs Syndrome, a neurologic disorder that affects sensation and movement in the legs and causes the legs to feel uncomfortable. *See* Mayo Clinic Staff, *Ropinirole*, *available at* http://www.mayoclinic.com/health/drug-information/DR601577 (last accessed Apr. 8, 2010).

extent, but that she continued to experience panic attacks daily. On December 12, 2007, plaintiff

arrived at the clinic without a warm coat, reporting that she stays awake all day and night and

that her pain medications gave her energy. She also stated that was trying to remain busy with

activities to avoid falling in to a "deep depression," and that her activities included cleaning,

reading and watching movies. On January 7, 2008, plaintiff expressed that the medications had

helped her significantly, and that her anxiety, panic attacks and difficulty sleeping had improved.

She stated that although she will never forget her daughter, she will move on and have a life for

herself. On November 14, 2007, Butler filled out a form entitled "Mental Impairment

Questionnaire (Listings)."[17] In the questionnaire, Butler confirmed plaintiff's diagnosis of Major

Depressive Disorder, Severe, and a GAF of 50. She indicated that plaintiff had the following

signs and symptoms: poor memory; sleep disturbance; emotional lability; oddities of thought,

perception, speech or behavior; social withdrawal or isolation; and blunt, flat, or inappropriate

affect. *Id.*

      In a December 2007 letter to the SSA summarizing plaintiff's treatment, psychiatrist

Rosaliya Vernikov wrote that plaintiff had been receiving services at Rockaway due to feelings

of depression since May 2007, and had been diagnosed with Major Depressive Disorder, Severe.

The letter states that plaintiff has been unable to sleep, is easily agitated and sometimes

explosive, that plaintiff is suspicious of others, that she reports panic attacks on a daily basis, and

that she isolates herself.

      Dr. Leslie Fine testified as a medical expert at the May 12, 2008 hearing before the ALJ.

After reviewing plaintiff's medical records, Dr. Fine concluded:

> All in all, the claimant does seem to be suffering from a depressive disorder,
> which has been called by a treating doctor, an adjustment disorder with anxious

---

[17] The record contains only three out of the five pages of the report.

12

and depressed mood, and by the [independent medical evaluation] a major depressive disorder, severe . . . . Also, she has a prior history of substance abuse and currently is taking Darvocet and Vicodin for pain, which apparently gives her energy. . . So I would think that substance abuse is still an issue in her case. I don't feel that she meets or equals 12.04 [20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.04 (affective disorders)] even though she suffers from depression. . . . . I think she is reacting to or was reacting to the losses she has sustained. And, she does have a mood disorder.

B.     *Plaintiff's Medical History of Back, Neck and Knee Pain*

Plaintiff's earliest complaint of physical ailments in the record is found in a December 21, 2005 intake evaluation at CMHC at which plaintiff complained of headaches and herniated discs in her lower back and neck.

In March 2006, plaintiff was seen by Dr. Nurse with complaints of chronic back pain. Dr. Nurse referred plaintiff to a neurologist. *Id.* Dr. Nurse's notes reflect that plaintiff continued to complain of chronic back pain on a subsequent appointment on April 11, 2006. On that date, plaintiff asked Dr. Nurse to complete an employability form. Dr. Nurse noted that plaintiff had no spinal tenderness. She prescribed Tylenol #3 and referred plaintiff for physical therapy. *Id.* Plaintiff's medical records indicate that she was taking Tylenol #3 the following month.

A consultative examination was performed by Dr. Dyana Aldea, an internist, on May 30, 2006. Plaintiff complained of lower back pain and neck pain as a result of a motor vehicle accident in 2000. She described the back pain as occurring every day with an intensity of 8 on a 10 point scale, and stated that it was aggravated by prolonged standing, walking, squatting and climbing, but relieved with rest and medication. She described the neck pain as occurring every day with an intensity of 5 on a 10 point scale, and stated that it was aggravated by prolonged standing, walking, movement of the neck, lifting and carrying items and by other activities of daily living, but mildly relieved with rest and medication. *Id.* On examination, Dr. Aldea noted

no abnormal findings, other than plaintiff's inability to squat beyond 50% before experiencing back pain, difficulty walking on heels and toes, and mild tenderness to palpitation on both sides of her neck. An X-ray of plaintiff's spine revealed lipping, disc space narrowing between the L5 and S1 vertebrae, and the straightening of the lordotic cervical curve.[18]  Dr. Aldea's diagnoses were low back pain, neck pain and depression. He concluded that plaintiff has mild limitation for squatting, with no other physical limitations, and provided a prognosis of "fair."

A non-examining reviewer (signature illegible) assessed plaintiff's physical RFC on June 28, 2006. The examiner noted that plaintiff had complained of back pain and determined that such pain could be attributable to the medically determinable impairments of lower-spine disc space narrowing and straightening of the lordotic curve. However, the examiner concluded that the "claimant did not describe how these symptoms limit his [sic] functionality," and stated that the treating source opinions were insufficiently specific to be translated into evaluative terms. Accordingly, the examiner concluded that plaintiff was able to lift or carry 50 pounds occasionally and 25 pounds frequently, to sit, stand or walk for about 6 hours in an 8 hour workday, and to push and pull without limitation.

MRIs of plaintiff's cervical and lumbar spine were performed on July 11, 2006 and July 15, 2006, revealing a bulging disc at C5-C6, mild disc desiccation at L3-L4, L4-L5, and L5-L1, and herniated discs at L3-L4 and L4-L5 with slight retrolisthesis.[19]  Dr. Aron Rovner, an orthopedist, reviewed plaintiff's MRI reports and examined plaintiff on July 25, 2006. Dr.

---

[18] "Lipping" refers to protrusions on the edges of a vertebrae, resembling lips. *See Stedman's Medical Dictionary* 1023 (27th Ed. 2000) ("Stedman's"). Straightening of the cervical lordotic curve refers to a loss of the normal curvature of the upper spine. It can be caused by degenerative disk disease, among other causes, and can in some cases lead to severe pain. *See Stedmans* at 1033; *see also* University of Maryland Spine Program: A Patient's Guide to Cervical Kyphosis, *available at* http://www.umm.edu/spinecenter/education/cervical_kyphosis.htm (last accessed Apr. 8, 2010).

[19] Retrolisthesis, a synonym of retrospondylolisthesis, refers to "slipping posteriorly of the body of a vertebra, bringing it out of line with the adjacent vertebrae." *See Stedman's* at 1563.

Rovner's notes state that plaintiff complained of pain and described a history of back pain which was exacerbated by motor vehicle accident on June 22, 2006. An examination revealed a severely limited range of motion of plaintiff's neck and lumbar spine. Dr. Rovner's diagnoses were lumbar radiculopathy with low back pain and neck pain associated with a cervical bulging disc. He recommended a trial of epidural steroid injections and that plaintiff continue with Tylenol #3. Plaintiff was evaluated at Arbor WeCare on August 2, 2006. The examining doctor, Dr. Anil A. Mathew, noted complaints of cervical and lumbar pain, depression and anxiety, and a possible history of psychosis. A physical examination was normal, with the exception of tenderness to palpitation in the cervical and lumbar regions. Dr. Mathew's report states that plaintiff had a good range of motion in her neck and back.

On February 20, 2007, plaintiff was seen the emergency room at St. John's Episcopal Hospital following a motor vehicle accident, as discussed briefly above. She complained of pain in her neck, right knee and lower back. The hospital triage nurse observed that plaintiff did not appear to be in obvious distress. Notes by Dr. Tuere Franklin state that plaintiff was observed moving her arms, legs, and trunk without any apparent discomfort or difficulty while waiting to be examined, and that plaintiff had been seen walking out of the hospital to smoke. X-rays of her right knee, right shoulder, and lumbar spine did not reveal any signs of acute pathology. Dr. Franklin also noted that plaintiff had a full range of motion in her back and joints. The diagnosis was back strain, and plaintiff was given a referral to a private physician. Plaintiff was seen by Dr. Rovner the following week, who diagnosed plaintiff with pain in the cervical spine, back, and knee, and signed a note stating that plaintiff may not return to work until further notice.

A MRI of plaintiff's thoracic and lumbar spine was performed on March 15, 2007,

revealing a posterior bulge at T11-T12 impinging on the anterior aspect of the spinal canal, and

posterior disc herniations at L3-L4, L4-L5, and L5-S1, impinging on the anterior aspect of the

spinal cord and abutting the nerve roots.  On April 4, 2007, Dr. Rovner signed a letter on

plaintiff's behalf stating that her neck and back conditions rendered her totally disabled from

work-related duties.  Records from plaintiff's treatment at Rockaway from May 2007 through

January 2007 (described in connection with plaintiff's psychological condition) reflect use of the

pain medications Vicodin and Darvocet, and the medication Requip.  Plaintiff also complained

on a number of occasions to Rockaway personnel about back and neck pain.  In an October 1,

2007 counseling session, plaintiff informed licensed social worker Butler that she had been

attending physical therapy for two years.  She stated that while she refused to take cortisone

shots,[20] she was exploring surgical options.  Additionally, in a December 2007 letter to the SSA

summarizing plaintiff's treatment, psychiatrist Rosaliya Vernikov and licensed social worker

Eileen Butler wrote that plaintiff suffers from back pain that makes it difficult for her to do basic

daily tasks such as cleaning, laundry and cooking.

On July 6, 2008, an MRI of plaintiff's knee revealed joint effusion and tears in the

cruciate ligaments and medial menisci of both knees.[21]   Dr. Mark McMahon signed a letter on

---

[20] Cortisone shots typically include a corticosteroid medication and a local anesthetic, are used to relieve pain and inflammation in a specific area of the body, such as in a joint. *See* Mayo Clinic Staff, *Cortisone Shots, available at* http://www.mayoclinic.com/health/cortisone-shots/MY00268 (last accessed Apr. 8, 2010).

[21] Joint effusion refers to an abnormal fluid build-up in the joint.  The condition may be the result of trauma, overuse or a disease such as arthritis. *See Stedmans* at 570; *see also* Michael W. Johnson, *Acute Knee Effusions: A Systematic Approach to Diagnosis*, American Family Physician (2000), *available at* http://www.aafp.org/afp/20000415/2391.html (last accessed Apr. 8, 2010).  The menisci (plural of meniscus) refer to the crescent shaped discs of cartilage in the knee joints. *See* Stedman's at 1091.  A torn meniscus may be the result of, *inter alia*, age-related degenerative changes to the knee. *See* Mayo Clinic Staff, *Torn Meniscus, available* at http://www.mayoclinic.com/health/torn-meniscus/DS00932. (last accessed Apr. 8, 2010).

plaintiff's behalf on July 23, 2008 stating that he considered her to be totally disabled and had advised her to refrain from work due to the diagnosis of bilateral knee medial meniscus tear.

## DISCUSSION

### I. Standard of Review

"A district court may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted). "Substantial evidence" is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)). An evaluation of the "substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); *see also* 42 U.S.C. § 405(g). Accordingly, the reviewing court may not "substitute its own judgment for that of the ALJ, even if it might have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

A claimant is disabled within the meaning of the Social Security Act if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that [s]he is not only unable to do [her]

previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

The Social Security Administration (the "SSA") has promulgated a five step sequential analysis that requires the ALJ to make a finding of disability if he or she determines: "(1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, . . . (4) that the claimant is not capable of continuing in his prior type of work, . . . [and] (5) there is not another type of work the claimant can do." *Burgess*, 537 F.3d at 120 (internal citations omitted, first alteration in original); *see also* 20 C.F.R. § 404.1520(a)(4).

The claimant must prove his case at steps one through four; accordingly, he bears the "general burden of proving . . . disability." *Burgess*, 537 F.3d at 128. At the fifth step, the burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that in light of the claimant's RFC, age, education and work experience he is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997). However, in making that determination, the Commissioner need not provide additional evidence about the claimant's residual functional capacity, but may rely on the same assessment that was applied in step four's determination of whether the claimant can perform his past relevant work. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also* 20 C.F.R. § 404.1560(c)(2). In addition, "because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Id.* (internal quotations omitted). *Burgess*, 537 F.3d at 128.

With respect to the determination of the nature and severity of a claimant's impairment,

> [T]he SSA recognizes a "treating physician" rule of deference to the views of the physician who has engaged in the primary treatment of the claimant. According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given "controlling weight" so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.

*Burgess v. Astrue,* 537 F.3d at 128 (citation omitted); *see also* 20 C.F.R. § 416.927. An ALJ who declines to accord controlling weight to the medical opinion of a treating source[22] must consider various "factors" to determine how much weight to give to that opinion. Those factors include: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Halloran v. Barnhart* 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 416.927). The regulations also specify that the Commissioner "will always give good reasons in his notice of determination or decision for the weight he give[s] [claimant's] treating source's opinion." 20 C.F.R. § 416.927(d)(2).

## II.    The ALJ's Disability Determination

Using the five-step sequential process, the ALJ determined at step one that the plaintiff has not engaged in substantial gainful activity since December 9, 2005, the application date. At step two, the ALJ determined that the plaintiff suffered from the severe impairments of back and neck pain, and depression. At step three, the ALJ determined that plaintiff did not have any of the *per se* disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or an

---

[22] "Treating source" is defined in 20 C.F.R. § 416.902 as including a claimant's "own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." Opinions by professionals such as licensed social workers or nurses are deemed "other source" evidence by SSA regulations, and are afforded less weight. *See* 20 C.F.R. § 416.913(d).

impairment equivalent to those listed impairments. At step four, the ALJ concluded that plaintiff

had the RFC to perform sedentary work, and that her RFC for sedentary work was "not

significantly diminished by her medically determinable physical or mental impairments," with

the exception of the fact that "the claimant may have difficulty performing some complex task

instructions independently." In reaching that conclusion, the ALJ declined to grant controlling

weight to plaintiff's treating source records, in light of the ALJ's view that they were "based on

subjective complaints and not clinical findings consistent with laboratory and diagnostic tests."

The ALJ additionally concluded that although plaintiff's medically determinable impairments

could reasonably be expected to product the alleged symptoms, he found plaintiff's statements

concerning the intensity, persistence, and limiting effects of those symptoms to be not credible

and not supported by medical records. However, the ALJ agreed with plaintiff's claim that she

was unable to perform her past relevant work as a home health aide. At step five, the ALJ

concluded that because plaintiff was classified as a "younger individual," and her nonexertional

limitations would have little or no effect on her occupational base of unskilled sedentary work, a

finding of "not disabled" was directed by the Medical-Vocational Guidelines at 20 C.F.R. Part

404, Subpart P, Appendix 2 ("the Grids").

III.  **Analysis**

   A. *The ALJ Failed to Evaluate Plaintiff's Mental Impairments Under the Proper*
      *Standard*

At steps four and five, the ALJ concluded that plaintiff's "capacity for sedentary work is

not significantly diminished by her medically determinable physical or mental impairments," and

that her psychological limitations, "have little or no effect on the occupational base of unskilled

work." . As explained below, that conclusion improperly discounted the opinion of plaintiff's

treating physicians, and failed to adequately explain the ALJ's reasons for not finding plaintiff's testimony to be credible.

The uncontested opinion of plaintiff's treating physicians was that plaintiff suffered from serious psychological conditions with symptoms that could be problematic in some work environments. *See, e.g.*, (June 2006 assessment by psychologist Dr. Glauberson that plaintiff's difficulties with anger "would significantly impair her relationship w[ith] any supervisor ."); *see also* (April 2006 assessment by Dr. Glauberson that plaintiff's sustained concentration and ability to work could be impaired due to her impulsivity and depressive symptoms); (December 2007 assessment by psychiatrist Dr. Vernikov that plaintiff suffered from Major Depressive Disorder, Severe, was unable to sleep, easily agitated and sometime explosive, suspicious of others, isolates herself, and has panic attacks on a daily basis).

That view was consistent with evaluations by consultative physicians and other sources, including assessments by consultative physician Dr. Krishna Badhey on December 2, 2005, (noting plaintiff's "functional capacity outcome" was "unstable" in light of plaintiff's medical and/or mental health conditions that required further treatment."); consultative psychologist Arlene Broska in May 2006, (confirming that "[r]esults of the examination appear to be consistent with psychiatric problems, and this may significantly interfere with the claimant's ability to function on a daily basis."); consultative psychologist M. Graff on June 27, 2006, (noting moderate or marked limitations in thirteen of twenty areas of mental functioning and concluding plaintiff would have moderate difficulty relating to others or accepting criticism from authority); and physician Anil A. Mathew on August 2, 2006, (noting that plaintiff was employable only with limitations, including the requirement of a low stress environment).

The ALJ's rejection of the opinion of plaintiff's treatment sources constituted error for two reasons. *First*, the ALJ stated that controlling weight would not be granted to the opinion of plaintiff's treating sources because those opinion s were "based on subjective complaints and not clinical findings consistent with laboratory and diagnostic tests." However, plaintiff's treating sources' opinions were based on the sorts of observable medical signs and symptoms well-accepted within their field of expertise, including tests of plaintiff's psychomotor activity, observation of her appearance, affect, and mood, and evaluation of her insight, judgment and cognitive functioning. *See* 20 C.F.R. § 416.928 (medical signs may include "abnormalities of behavior, mood, thought, memory, orientation, development or perception" which can be "shown by observable facts that can be medically described and evaluated."). As the Second Circuit has recognized, subjective complaints may themselves constitute an objective medical sign when properly used as a diagnostic technique. *See, e.g., Burgess*, 537 F.3d at 128 ("'[M]edically acceptable clinical and laboratory diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s an essential diagnostic tool.'") (citation omitted); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)) (finding that it was error for ALJ to require objective medical findings when the underlying disease presents no such measures).

*Second*, under the applicable SSA regulations, even if controlling weight is not given to the treating physician's opinion, the ALJ must assess the factors listed in 20 C.F.R. 416.927(d)(2)-(6) in order to determine how much weight to give to that opinion. Those factors include: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination by the treating physician for the conditions in question; (3) the medical evidence and explanations provided in support of the opinion; (4) the consistency of the opinion with the

record as a whole; (5) the qualifications of the treating physician; and (6) other relevant factors tending to support or contradict the opinion. The ALJ declined to address how much weight, if any, was given to the opinion of plaintiff's treating sources, or to explicitly consider the required factors here. Accordingly, remand is appropriate. *See, e.g., Hach v. Astrue*, No. 07-CV-2517 (ENV), 2010 WL 1169926, at *11 (E.D.N.Y. Mar. 23, 2010) (finding ALJ's failure explain how much weight was given to treating source's opinion constituted proper grounds for remand).

Further, the ALJ's finding that plaintiff was not entirely credible was not based on an evaluation of the appropriate factors. When the objective evidence alone does not substantiate the intensity, persistence or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929. Although the ALJ apparently did not credit plaintiff's testimony as to her subjective symptoms, including frequent panic attacks, debilitating depression, and visual hallucinations of her deceased daughter occurring almost daily, the ALJ did not refer to the 20 C.F.R. § 416.929 factors either explicitly or implicitly. Rather, the ALJ's conclusion appears to have solely based his interpretation of counseling records from plaintiff's final sessions at Rockaway, which he viewed as suggesting that plaintiff's symptoms had improved. However, no doctor (including the independent medical expert who testified at the

May 12, 2008 hearing) viewed those records as demonstrating that plaintiff no longer had significant limitations due to her psychological condition; accordingly, the ALJ's conclusion constituted an improper substitution of the ALJ's view of the medical proof for the treating physician's opinion. *Shaw v. Chater*, 221 F.3d 126 (2d Cir. 2000).

On remand, the ALJ should re-evaluate the severity of plaintiff's psychological conditions in light of the treating source rule and give careful attention to the factors to be considered in assessing plaintiff's credibility. If the fifth step of the sequential analysis is reached, the Court suggests that the ALJ enlist the assistance of a vocational expert to determine whether plaintiff's nonexertional limitations will preclude any realistic chance of employment. *See Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) ("sole reliance on the [g]rid[s] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform. In these circumstances, the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.") (citation, quotation marks and footnote omitted); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Sec. 200.00(e) (grids may not be applicable where nature of impairment is not solely exertional).

B.    *The ALJ Failed to Evaluate Plaintiff's Physical Ailments Under the Proper Standard*

The record of plaintiff's physical ailments is susceptible to multiple interpretations. Nonetheless, remand is required because the ALJ did not properly evaluate plaintiff's credibility or determine what weight should be afforded to her treating physicians' opinions. The ALJ gave significant weight to a May 2006 consultative examination by Dr. Dyana Aldea, an internist, on

24

May 30, 2006, which concluded that plaintiff had minimal limitation only for squatting. The ALJ also credited the statement in hospital records from February 20, 2007 that plaintiff retained a full range of motion in her back and other joints. However, he apparently rejected entirely the April 4, 2007 opinion of treating source Dr. Rovner that plaintiff suffered from pain from lumbar radiculopathy, and was totally disabled. The ALJ also found plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms to be not entirely credible.

The ALJ appears to have based his rejection of Dr. Rovner's opinion and plaintiff's credibility on the following three facts: 1) examinations in May 2006 and April 2007 did not reveal significant limitations; 2) plaintiff had not reported "radiating or radicular symptoms;" and 3) plaintiff "had been treated conservatively." While the first constitutes a proper factor to be considered in determining whether to credit plaintiff's testimony or the opinion of treating source Dr. Rovner, the latter two reflect an improper substitution of the ALJ's view of the medical proof for the treating physician's opinion. No doctor described plaintiff's treatment for back and neck pain as "conservative," or identified the lack of radicular symptoms as significant. As the Second Circuit has cautioned, neither the district judge nor the ALJ may rely "on his or her own notions of severity based on the intrusiveness of a course of treatment in order to rejects a treating physician's medical judgment that a condition is severe." *Id.* Finally, if the ALJ, like the non-examining reviewer, views Dr. Rovner's opinion as incapable of "be[ing] translated into evaluative terms" because it is insufficiently specific, the ALJ should re-contact Dr. Rovner and seek clarification. *See* SSR 96-5p.

## CONCLUSION

For the reasons set forth above, this matter is remanded to the Commissioner's for further proceedings consistent with this decision.

**SO ORDERED.**

/s/(BMC)

U.S.D.J.

Date: Brooklyn, New York
      April 8, 2010